Good morning, Your Honors, and may it please the Court. I'm Sarah Wilson, here representing the United States, and I'd like to reserve four minutes for rebuttal. All right. Watch your clock. I will. Thank you, Your Honor. In the four statutes that are at issue in this appeal, Congress carefully designed a framework for the detention of four different categories of aliens during the two different stages of the removal process. First, during the limited period during which the government works to secure a final order of removal. And second, during the period of time the government conducts sensitive negotiations to execute that final order of removal. The district court's injunction... Could you both slow down a little bit and speak louder? I will do my best. Okay. The district court's injunction ignores Congress's clear intention that individuals covered by these provisions would be treated differently. And instead, the injunction imposes a uniform requirement of bond hearings after 180 days of detention, regardless of any other fact or circumstances dealing with the individual's detention. The injunction also establishes a procedure... I'm sorry, Counselor, what do you mean orders of bond hearing without regard to any other fact or circumstance? Any other fact or circumstance. What are you referring to? Well, it means that the bond hearings have to occur after 180 days, regardless of where the individual is in the process. So, for example, somebody who has not even been through the entirety of the administrative process, hasn't gotten to a final order from the immigration judge, or an order from the board would be treated the same as somebody who, for example, is under 1231A2. That's during the 90-day mandatory period during which an individual has to be detained. The injunction makes no difference between all of those individuals, and there's a uniform requirement after that 180 days to conduct a bond hearing. So are you arguing that there should be a different time period depending on where an individual is in the process? We think that it's inappropriate for the court to have imposed a 180-day requirement across all of these statutes. What that ultimately does is take four very different statutes with very different standards and procedures and imposes the same standard on them. Okay, so you say that's wrong, but what should he have done to accommodate that kind of difference among the statutes? I think class treatment is inappropriate as a result. Didn't that get decided about two times ago? This is our third time on this case, right? That's right, Your Honor, but I think that our class certification argument is pretty specific. It's that if you agree with us on a merits question, which is that 180 days is not necessarily going to be the baseline for when somebody becomes entitled to a bond hearing, that means the court has to then revisit whether class treatment was appropriate at all. We think that the best way to go forward is to allow these individuals to bring individual as applied challenges. They can come and show that their individual facts and circumstances, that can include the length of detention, demonstrates that they have an interest in receiving bond. Otherwise, we think that it creates a system that doesn't look anything like the one Congress designed. The injunction also establishes a procedure and heightened standard for those hearings that's completely different than the standard and procedures that's set up in the INA and its regulations. So instead of following the standard that's set forth in the regulations under 236.1, the district court in the injunction requires that the government bear the burden of showing that this person is not a flight risk in danger. And as we set forth in the papers, that causes a lot of problems, especially with regard to the class of arriving aliens where we know very little about these individuals. We don't have, sometimes aren't even able to verify their identities. And then we're having to go in after 180 days of detention and basically make the case to another court that we should be entitled to detain them. That's not the standard that Congress set up. Congress set up a system where we were required to maintain control over our borders for the entirety of that period and not just have that expire after 180 days. As a result, we think that the injunction sets up a system that isn't a plausible reading of the INA. It's also fundamentally at odds with Congress's legitimate findings that these statutes and the way that they're drafted go towards the government's three legitimate interests, which is ensuring that individual aliens show up for their proceedings, ensuring that they don't commit additional crimes while they remain in the United States, and that at the conclusion of those proceedings they can be expeditiously removed. Now, the court has not addressed the legal issues associated with two of the subclasses. I want to start briefly with 1231. So do you think with respect to the first two categories we are bound by the law of the case? We have suggested in our papers that that's not necessarily the case because we now have a complete factual record in this case that this court can look to and decide whether. But are these really factual questions? Given that the rationale behind the decision on the preliminary injunction was one of constitutional avoidance, I don't see what new facts would change that legal analysis. I think it's precisely because the question was one of constitutional avoidance. The court was trying to avoid applying the statute in a way that would cause an individual circumstance to cause a due process concern. As we know, due process is a highly fact-intensive inquiry. Now we have new facts that sets the court to be able to look at those facts and say, What are the new facts? Counsel, this is an oral argument. It's really hard to be trying to have a conversation with you when you're talking so fast and don't really answer the question. So we're trying to explore your position, all right? So just take a breath and start having a conversation about this because I really want to understand your position. Thank you, Your Honor. I appreciate that. Okay, so what are the new facts? We've presented evidence that class members are requesting and being granted continuances at an extraordinary rate. We've suggested that during the first initial 180 days, that's the period during which the court found that there was a serious constitutional concern, that those individuals are requesting two, maybe three continuances on average. That's accounting for a large portion of the amount of time that the government has, under the statute as interpreted by this court, to conduct its proceedings. We think that that strongly undermines the idea that there is necessarily, after 180 days, a constitutional problem. Also, we know that under 1225B, the injunction is creating what Zavidas and the Quan Court described as an unprotected spot in the nation's armor. Prior to the injunction, 1225B subclass members, those people who had never been admitted into the United States, never crossed through the borders, could only be admitted through the interior, through the parole process. Now, under the injunction, the government's required to release those individuals unless the government shows, by clear and convincing evidence, that those individuals will not be a flight risk and danger. As I've already explained, that presents untold difficulties for the government. These individuals sometimes come across with fraudulent documents, false passports, and they are people that we're having trouble identifying their identities. The record now demonstrates that some of those individuals, individuals that Congress said could not be admitted during the pendency of the removal proceedings, have now been released into the interior. All this was done under the court's concern over the potential for an arriving lawful permanent resident being treated under the statute. Now we've been through the discovery process and found that the occurrence of arriving LPRs being treated under the statute is going to be extraordinarily rare. We think that that undermines the idea of applying constitutional avoidance here because the serious constitutional concern is perhaps not so serious, but also it's applying quite a fix to a very small problem. If the idea under constitutional avoidance is to make sure that we're giving full effect to the statutes and to Congress's intent, it would certainly be a lot easier to do that if we carved out those legal permanent residents or allowed— It's Judge Gould. I apologize for interrupting. But I do have a question I'd like you to address for me. And also I would second Judge Wardlaw's comment. If you could slow your presentation a bit, it might be more effective. My question specifically is on the burden of proof. Was the burden of proof issue that you're raising before us on the preliminary injunction? Did our opinion address that in that case? We believe—so the Court makes a passing reference in Rodriguez 2 to CASAS and discusses it in the context of why parole under the preliminary injunction standard may not necessarily be sufficient. But the Court did not dive into the question of whether the remedy for the 1226C and the 1225B subclass has to be a clear and convincing evidence standard. So we think it would be appropriate, even if the Court doesn't believe by our arguments that you're able to address the questions from Rodriguez 2 again. We think that that question was not firmly decided by the Court. The nature of the burden or the burden shifting question? So the nature of the burden. I understood that to be your question, Judge Gould. Is that correct? Really my question would go to both. One, whether the burden should be on the alien to show there's no danger or he or she is not a flight risk, as opposed to the burden being on the government to show those things exist. And the other is the standard. What's the—is it clear and convincing? And so I don't think that the Rodriguez 2 Court answers that question of burdens. The clear and convincing standard. So whether it's the clear and convincing standard and whether the burden is on the government or on the alien. We've submitted extensive argument through the District Court about why we think the 1226A process should govern if there is indeed going to be a shift from the mandatory detention statutes to another statute at some period of time. It makes sense if it's truly a constitutional avoidance theory and truly a matter of statutory interpretation that then this statute, 1226A, would govern those proceedings. There, there would be no need to have a CASA-style hearing. And we think that that places the burden appropriately. Just recently, just on Wednesday, we had an article run in the LA Times where an individual class member who was a 1226A class member who originally was denied bond under that standard— Have we taken judicial notice of that article? Oh, Your Honor, this was an article that just ran on Wednesday. Uh-huh. That individual— Have you read that article? I have, Your Honor. And it was interesting. I read that article, too. And it was interesting that the person was charged under state law, right? But in the first paragraph, it said, according to federal authorities. So can you tell me who the federal authorities were who gave this information to the LA Times? I don't believe our office comments, so I can't tell you that, Your Honor. You really have no idea? I really don't. Well, since you brought that up, I was curious about that. I would like—I think after conference, perhaps we'll issue an order to the government. I would like to see the transcript of the hearing where the immigration judge determined that this particular sexual offender who's obligated under state law to register was deemed not dangerous to the community and not a flight risk by your Department of Justice immigration judge. And I would also like to see what the nature of the evidence was that the government presented at that hearing. Well, we certainly can respond to whatever order the court gives us, but I do want to make one point. Do you know, since you're bringing this subject up, do you know? We know that initially the hearing was conducted under the 1226A standard, that the first hearing when he was taken into custody was conducted under that standard. That standard places the burden on the individual alien to prove that he is not a flight risk or a danger. The IJ denied bond said that this person is not entitled to release. It was only after 180 days passed, and we then conducted the hearing again anew under the standard under the preliminary injunction, which requires the government to approve by clear and convincing evidence, that that individual was released. It was concluded by the immigration judge that the government had not carried the burden of establishing that that person could be released. So it was the immigration judge's decision to release this person. That's right. In the article. So it was your department's decision to release this person. That's right, Your Honor. And I'm not sure that that person would have necessarily been released by anybody else. That's exactly the problem that Congress was faced with when they passed 1226C in the first place. They were faced with evidence that individuals that Congress thought should not ever have been released under any standard, much less a standard that is actually lower than the one imposed by the preliminary injunction. And Congress made the decision that we should take that decision out of the hands of the immigration judges and make it so that there's no assessment for flight risk and danger during that period. I was also wondering about the timing of that article, the fact that it was released by federal authorities, the information and the timing. It was Wednesday of this week. Do you think there was any object in giving that information to the L.A. Times to influence the outcome of this proceeding? I certainly have no reason to believe that, Your Honor. As far as I know, this was not something that anybody in our office approached that way. Well, as far as you know, you may be getting another order telling us who exactly was the source for that story. You're not the press, and you don't have the right to protect that information. I understand that, Your Honor. It certainly didn't come from me. And you do realize it would not be very ethical or proper and perhaps could be even criminal to have given information to the L.A. Times to possibly influence the outcome of this hearing. The timing was very coincidental. I apologize, Your Honor, but it's not something that we, as far as I know, was anything we had anything to do with. You can say that, but maybe we'll find out. Okay. Well, Your Honor, I do think that the point stands. But this is a concern. And anyway, it's not really evidence. I don't know why you brought it up. There you go. Yeah, it's not evidence in front of us, so there's no point in bringing this up. It's really improper, and I would recommend we don't even talk about it anymore. We'll determine later what to do about it. Okay, Your Honor. We do think that if there's – Please do not discuss the subject anymore. It's not record evidence. It's post the district court's decision. It's information from a newspaper, from a source who we don't know. So we're going to have to talk about now, because you raised it, what we do about it. I was hoping you wouldn't raise it, because it's totally extrajudicial and it's improper to be raised. But you raised it, so now we have to figure out what to do. Your Honor, I think we can move forward. I really wish the government hadn't just stuck with the arguments in their briefs and what was before the district court. It's a serious – this is a very serious issue, and it's an important issue. And we think – And you should not debase it by bringing in stuff that's in a newspaper. Your Honor, we simply wanted to present some – No, you're not allowed to do that, and let's just move off that topic. Okay. Can we continue to talk about 1226A standards? You're at your four minutes, but yes, you may. Your Honor, I'll just touch briefly on 1231, the post-order detention statute. That's one issue that this court has not addressed in Rodriguez too, and we think that it's a pretty clear indication. Is 1231 the one that already provides the bond hearing? So 1231 is the post-order detention statute. That's the one that Zavidas and this court in Doof already interpreted as giving the government an entire 180 days following that final order. So you have 90 days where it's mandatory detention? That's right, Your Honor. Okay. And then we also have a period of time that 1231A2 – well, I got it wrong – C1, actually, extends that 90-day period where an individual alien is not complying with removal efforts. So, for example, if somebody is refusing to board the plane, refusing to make good-faith efforts to get travel documents, that individual, by statute, is barred from getting released. That's somebody that the government has a legitimate interest in continuing to detain. So we think that the district court's order errs because it clearly violates that provision of the statute and the provision of the statute that gives us additional time to continue to hold those individuals while we do the sensitive negotiation process of effecting removal. I'll reserve the remainder of my time for it all. Thank you. Good morning, Your Honors. Good morning. May it please the Court. Ahilan Arulanantham from the ACLU for the petitioners. And with the Court's permission, I would like to discuss the issues concerning the right to a CASAS hearing for each of the subclasses. And my co-counsel, Mr. Coffman, will discuss the issues concerning the hearing adequacy. And I'd like to reserve half of our time for him, if that's all right. All right. You better keep track of it. I will do my best, Your Honor. Okay. Your Honor, we framed the question during the preliminary injunction litigation as the entitlement to a CASAS hearing. And the district court's order in the preliminary injunction set the burden of proof on the government by clear and convincing evidence. This Court in Rodriguez-Strew, Your Honors, cited V. Singh, which is the Ninth Circuit case, which established the clear and convincing burden of proof in 1226A cases and applied that to the two subclasses who were at issue in the preliminary injunction. So I think on the question whether the burden of proof was before this Court, the answer is yes. As a general matter, under Ninth Circuit law, all four subclasses are clearly entitled to CASAS hearings because they have all been subject to prolonged incarceration. And Congress did not speak to prolonged incarceration under these particular statutes. That was the holding as to each of those statutes, even before Rodriguez-Strew was decided. So on the question whether each of these detention statutes can be read to authorize prolonged mandatory detention or prolonged detention without hearings, the answer is no under this Court's law and was actually already no at the time that we argued Rodriguez-Strew. In addition, Your Honor, even the government just now and in their briefing in various other places, they concede that there are some prolonged detentions that give rise to serious constitutional problems. Mr. Rodriguez himself, he was detained for over three years without a hearing. He was eligible for cancellation of removal, which he then won. And instead they say, oh, these should be done through individual habeas petitions. But as Your Honor explained, that is not what the rule of constitutional avoidance requires. If the statute can be read to avoid the serious constitutional problem and the problem is arising, then the Court's obligation is to construe it. And so I think despite the fact that you see a wealth of factual information that we worked very hard to put before the Court, I don't think any of it's relevant on the question of entitlement to a hearing for these four subclasses. What is the notion of prolonged detention equating to 180 days derived from? A few places, Your Honor. It's first that fourth actually in Nataraja, a Ninth Circuit case from 2006. That's a 1225B detainee who is, by the way, arriving at the border, but the Court construes the statute in light of the problems of returning lawful permanent residence all the way back then. So to reverse that, as my opponent asked you to do, you'd really have to go back and reverse Nataraja essentially. And then, of course, Rodriguez, too, acknowledged that. I understand that to a certain extent even Rodriguez, too, was based on prior controlling authority that we have no ability to overrule unless we were to go en banc. Correct, Your Honor. I would agree with that. There's two other sources for the 180-day rule, which we think are very important. In JUF II, which is about a 1231A class member, the Court holds that detention becomes prolonged because the liberty interests are profound at 180 days and actually doesn't cite Nataraja, just independently makes that determination. And then we also think it's highly pertinent that Congress did specifically authorize prolonged detention without hearings for six-month intervals, but subject to periodic review by the Attorney General, actually, and the Deputy Attorney General in the Patriot Act, as to national security immigration detainees. And they specifically reference six months as the time period in that statute for certifications that the person remains a threat have to happen every six months. So I think that's relevant to a lot of issues. I think it's relevant to the statutory question here. It was cited in Nataraja, that statute. It's also relevant in this topic. I also have no desire to discuss it. But when we're talking about when do we accept zero risk of recidivism, when are we willing to say we never want judges to ever make predictive errors? Well, Congress authorized prolonged mandatory detention for national security threats and basically said the Attorney General is going to be the one deciding when that person is no longer a threat. But they didn't authorize prolonged detention without any release hearing process for other sets of people. And that's what our class is about. Judge Gould, if I may interject, please, and I'm sorry for interrupting. Never, Your Honor. One of the questions on my mind is on the burden of proof, is where does the shifting of the burden of proof come from, either in our precedent or Zedvitas? I thought that Zedvitas itself had said something that supported the six-month period being significant. Maybe I'm wrong in that, but to me that wasn't the issue. It seemed to me that people are going to be entitled to a due process hearing after a lengthy period. But at that hearing, does the government have to show that they are not a danger or that they are a danger, or do they have to show they are not a danger? Let me answer the burden of proof question first and then the Zedvitas question, Your Honor. The burden of proof issue is first put on the government in a case called Tijani, which is also a Ninth Circuit case. It's from 2005. And in that case, the court cited Cooper v. Oklahoma, which is a case about civil detention authority more generally, and says the burden of proof is always on the government when we're talking about civil deprivations of liberty. Then, again, in V. Singh, which is the case that Your Honor relied on in Rodriguez II, it's developed in a much greater detail, and there the court cites a number of civil detention cases, Addington, Texas, Fushebi, Louisiana, I believe, and it's just describing the general practice that in civil detention contexts where liberty interests are significant, the government bears the burden of proof. In fact, if you look, Your Honor, there's an amicus brief from the Bazelon Center and the NACDL, the National Criminal Defense Lawyers, and they describe this across a number of civil commitment and pretrial detention statutes. They say it's essentially the universal rule that the government bears the burden to show that the detention is necessary. And this court has applied that doctrine to the prolonged detention context, as I said, first in Tijani and then in more detail in V. Singh. Doesn't government counsel have a good point, though, as to arriving aliens when the government really doesn't know much about them? I've seen enough immigration cases to understand that. Yes, Your Honor. I think there's something in that argument as to the initial release process because the person could come here and not be very, you know. Our case is not about that. Our case is only about people who have been detained for six months. So at that point, we're talking about people who are well into the process. And remember, the government has to adjudicate the asylum applications of these people. And so they do investigation. They have to. And, you know, if they're unable to do that investigation, I guess this is the other point there I would say. If there's a person and there are no identity documents, and despite six months of investigation and a pending asylum case, they still cannot figure out, you know, who this person is, what country they're from, or anything like that, that to me is a valid basis to find a flight risk. It's also a valid basis to deny asylum, by the way. You cannot win asylum under BIA case law. That's right. So, I mean, I don't see that as a serious problem. I think also we have lived under this injunction for two and a half years. We have data on the injunction from a year and a half worth of data. If this were a significant problem, one would expect that the government would have had, you know, data to show that the 1225B detainees are winning release at some much higher rate than other people. And there's no evidence to show that. There's no evidence that, in fact, that group of people are treated any differently. The other brief thing I'll say about that, Your Honor, is, you know, they say there's no discovery about the returning lawful permanent residence. They didn't raise it in the district court either time. You know, after the argument here, I met a returning lawful permanent resident and put his documents into the record, which is it's in the supplemental excerpts, right? They never argued it. If they had, we would have put more. You know, it is a fact that returning lawful permanent residents get detained. They're not a huge part of the class, but they are there. Judge Gould, I don't know if you remember my colleague, Mr. Kaufman, who will be speaking in 50 seconds. We actually argued a case about a returning lawful permanent resident. It was called Molina in front of you, Your Honor, and that's another person. He was detained for two years in the Central District of California. It definitely happens. The last thing I'd like to say, Your Honor, is there are three sets of undisputed facts that we think really buttress not only Rodriguez II, but all of this court's prolonged detention case law going back 10 years. Maybe when I come back, we're the sur rebuttal, right? So we get a little bit of time at the end. You know, the hearing outcomes, the fact that 70 percent of the people are found eligible for release on bond by immigration judges, the outcomes of the cases on which there is no material dispute, almost one in three or about one in three will win their cases, very different from DeMaury v. Kim in that sense, and the detention lengths. All of those, I think, are very important facts which show the correctness of really a decade's worth of prolonged detention case law. So, Your Honor, unless you have another question, Judge Goulder, let me see if we have time. I don't at this time. Thanks. Thank you, Your Honor. Good morning, Your Honors. My name is Michael Kaufman on behalf of petitioners. With the Court's permission, as the counter-appellees here, we would like to reserve two minutes of time for rebuttal. Your Honors, the petitioners have sought five procedural protections at prolonged detention bond hearings. Beyond that, which is already required under this Court's precedent, two of those procedures, consideration of alternatives and adequate notice, the district court ordered below. And because the government hasn't challenged the notice requirements here, only the alternatives requirement is at issue in this appeal. The district court declined to order the three additional procedures we sought, consideration of length of detention, periodic review, and consideration of ultimate removability. I'd like to begin by discussing what's perhaps the most critical procedural protection, that is consideration of alternatives to detention. The district court below ordered that immigration judges should be considering alternatives in making danger-in-place risk determinations and that those alternatives include but are not limited to a release on monetary bond. So, for example, forms of supervision or electronic monitoring. Now, this requirement flows from the well-established due process principle that when the government is going to restrict an individual's liberty, they can't do so in a manner that's excessive to or not reasonably related. What process, if you know, are the immigration judges following now? Are they imposing conditions on release? Your Honor, we do have data that the government has provided on bond hearings conducted under the permanent injunction. And that reveals in less than 1% of cases that immigration judges are ordering a class member's release on alternatives alone, that is without a monetary bond. In approximately 10% of cases, they're ordering a class member's release on monetary bond and some form of alternative detention supervision or monitoring. One reason why we've raised this issue in this appeal is that's a surprisingly low number in light of two well-established facts in the record. One is that of ATD's proven effectiveness. The government's 30B6 witness, Eric Saldana, their 30B6 witness on the topic of alternatives, testified that in the San Bernardino area, the area in which he works, their ATD programs have a near 100% success rate, and it's over 90% in the Los Angeles area of responsibility overall. And for that reason, for due to their remarkable success rate, ICE has increasingly relied on ATD programs in the L.A. area. I think another important factor here is that the characteristics of the class members at issue here make them exceptionally strong candidates for release on ATDs. Just a moment, counsel. Your argument seems to suggest that the immigration judges aren't giving consideration to alternatives. Is that your position? No, Your Honor. I think it's clear that if they are giving consideration, and the numbers just happen to be low in terms of people released, are we to draw the conclusion that the judges are not doing their job and that we have to mandate something different? Well, to be clear, Your Honor, it is clear in some cases that judges have considered it. It's in the small minority of cases where they have ordered release. Now, this was an issue that the government appealed. It was in Judge Hatter's order below. It's definitely before this Court, and we just think it's important for the Court to clarify, again, as Judge Hatter did, that this is the type of consideration that immigration judges should be taking into account in making ordinary danger and flight risk determinations. I don't think the Court needs to do anything more than that in this case here, more than uphold that requirement and further establish that it is well supported by this Court's case law and it's well supported by the record evidence below. The characteristics of this class here, we know that they have very deep family and community ties among the 1226C subclass. Eighty-four percent have been in the United States for more than five years. Over a third of them- Those are just statistics that support some alternative resolution other than detention. Exactly. My question is limited to your position. Are you arguing that this Court should mandate that every immigration judge who conducts one of these hearings should go through these steps somehow on the record to establish that alternative to detention are not required? No, Your Honor. All we're asking is that immigration judges be required to consider whether there are alternatives available to the government that would adequately- Isn't that implicit within the authority that the judge already has? We would agree with you, Your Honor, on that point, and I think Judge Hatter did as well when he observed that immigration judges should already be considering alternatives. So again, Your Honor, I don't think we're asking you to do much more than Judge Hatter has already done here. I only mean to suggest that I think that Judge Hatter's order and his observation that alternatives should be employed at immigration bond hearings are well supported by the record here and nothing really more than that. I just don't understand why the immigration judges wouldn't be doing that anyway. If they're thinking someone should be released because they're really not a flight risk or a danger to the community, why wouldn't they want to keep track of them? Absolutely, Your Honor. I think it's just another tool that immigration judges have available to themselves to ensure in cases where there may be some concern about flight risk, for example, that there are methods- Well, I think if there's concern about flight risk, they shouldn't be released. Sure. I think in certain cases the concern about flight risk may be so extreme that it'd be warranted, but there may be others where on, let's say, certain forms of monitoring or electronic bracelet that concerns about flight risk can be addressed through those alternatives. If I may, Your Honor, just briefly I want to turn to two of the other requirements that the district court judge declined to order, consideration of length of detention and periodic review. Well, your argument about periodic review begs the question of when the 6 months begins to run. So for at least two of the statutes involved, one, the detained alien has the right to request a bond hearing, and I'm just wondering if once the alien requests a bond hearing, he has that bond hearing, shouldn't the 6 months run from the day of that bond hearing as opposed to the initial detention? And similarly, with the mandatory detention period, shouldn't the 6 months run from the end of the 90 days where Congress has mandated detention rather from the beginning of the 90 days? No, Your Honor, and I think that's because that's not how this court has counted detention lengths in this court's prior pro-line detention case law. For example, in the Casas case- No, but we've never precisely, especially in the mandatory detention area, we've never precisely ruled on that question. No, I agree, Your Honor. I just need to suggest when this court has looked at detention lengths previously, for someone like Mr. Casas, for example, that's someone who had moved through the immigration process and had been detained under different statutory authorities over that time. He'd been 7 years. Mr. Casas had been 7 years. So under any calculation from the beginning date, it would have met the 6 months. Well, that's true, Your Honor. But in Duke, this court, in Duke 2, excuse me, this court held that when detention hits 180 days, that the deprivation at liberty at that point is profound. And if you've been locked up for 180 days, it shouldn't matter, you know, what's happened prior in your case. But it should because it's a question of process. This is all about due process. And so if you've had process, and you've had some process, you haven't been detained without any process if you've had a bond hearing, discretionary or not, right? I mean, this is all about process. None of this has been about that DHS has to release anybody. It's just about process. That's correct, Your Honor. And with respect to the 1226A subclass Your Honor is referring to, get bond hearings at the outset of their cases, we shouldn't be asking that they get the same relief that's available to other The government here has made much of the fact that if anything, that subclass is most deserving of the best procedural protections because they have limit or no criminal history. And I think it would be anomalous to deprive them of due process protections that exist for 1226 detainees, 1225 detainees, and 1231 detainees, but deprive those individuals who, even on the government's view, are in some ways the most deserving of due process protections. I would also say, Your Honor, that I think this question has been to some degree addressed by this court's case law when it has shifted detention authority to 1226A. It has required bond hearings under 1226A at six months. We think as a matter of statutory interpretation that that implies that all the individuals subject to detention authority are entitled to a bond hearing at six months. I realize I only have about 20 seconds left, but I'd like to leave the last few words on rebuttal. The other thing you want to say is that then you should get, if you have a bond hearing and you're not released, you should have another one in another six months. That's the other argument. Yes, Your Honor, and I think that is a well-established principle in the civil detention context. Again, here I refer, Your Honor, to the amicus brief submitted by the Bazelon Center and NACDL that shows that it's a near universal requirement that if the government is going to lock up people for really prolonged periods of time, that they have to just conduct some periodic review to ensure that that lengthy deprivation of liberty is justified by whatever grounds the government has to offer on it. Thank you, Your Honor. All right. I'll start by pointing out that a number of these. Wait a second. I just got excited. Slow down. I'll try. I'll try. Okay. I apologize. We're trying to follow your argument. Make it harder. All right. So a number of the facts that were raised by Petitioner's Counsel, I think it bears mentioning that all of these facts are things that were disputed in the record. The district court declined to make any factual findings or to resolve any of the evidentiary objections that we made below. So these claims that the success rates on appeals are quite high, that was a disputed fact. The claim regarding the success rate of the alternatives to detention program, that's also a disputed fact. We pointed out through the same government witness. Is it relevant to the legal question? Well, apparently Petitioner's Counsel thinks so. I mean, they keep pointing out all these facts. It doesn't matter what they think. I'm asking you, what do you think? Is it really relevant to the legal question? We think that this case could be decided based on the statutes being facially constitutional. But to the extent that Petitioner's Counsel want to argue that the particular characteristics of their class members make it such that they're entitled to more under the Constitution, we think that it bears noting that we've contested all of those facts. So I would just refer the court to the record where we've disputed those facts below with the district court and encourage the court not to rely on those in resolving a motion for summary judgment that was granted in their favor, not in the government's favor. I also wanted to point out that the record demonstrates the government's inability to meet the clear and convincing evidence standard. We've submitted the compliance documents that shows that of all the bond hearings that are conducted, 70% of these individuals, individuals that Congress said would be not entitled to release under any circumstance during the pre-order period, have been released. That's pretty firm evidence that the government's not able to meet the heightened burden that's established by the preliminary injunction. As a result, we would suggest that 1226A would be the best way to establish the procedures going forward with any remedial bond hearings. It's set up in a manner that deals with the alternatives to detention question naturally. It's built into the system where we have the proper authority, that's the Immigration and Customs Enforcement, the people that are in charge of managing that program, increasing the supervision or decreasing the supervision as particular situations warrant. Those people had the first opportunity to make the individualized assessment under 1226A. We think that that's the correct way to do it. Only after that assessment's made would an individual then appeal that to an immigration judge and then have the opportunity to appeal that again to the board. We think that that sets the best procedure for going forward. It also solves the problem of the cross-appeal where you're wondering when does somebody get an additional bond hearing. 1226A, as drafted by Congress in the INA, answers that question. The answer to that question is whenever an individual can show that there are changed circumstances that would bear on their ability to get released, that bear on their flight risk and dangerousness, that individual has an opportunity to have as many bond hearings as is necessary to resolve that question. There's no need for the court to impose mandatory periodic reviews just based exclusively on the length of detention. All of these factors that they're trying to interpose into the bond hearings are ones that have not to do with flight risk or danger but have to do with the preliminary due process question. Is there a due process violation? This court would be answering that question already if they're ordering bond hearings. This court would be saying we've evaluated the due process factors and found that there's entitlement to relief, and the relief being a bond hearing. So I think it bears noting that petitioners haven't shown that there is a right under this circuit's precedent or under Supreme Court law, Supreme Court precedent, to a right to release. The right is not to release. The right is to have a periodic or an individualized review of your flight risk and dangerousness. 1226A provides that opportunity. So we think it was improper both for the court to provide relief to the 1226A subclass as a matter of right, but also for the court to impose any standards that are different from what is set forth in 1226A. All right. Thank you, counsel. Very briefly, Your Honor, four points. The injunction only applies to people with pending cases, people whom the government does not have authority to deport. And that's the reason why their argument about the 1231 subclass is wrong. If you are in the removal period where you can be deported, you are not a class member. If you have a stay of your removal, then you are a class member. And that also, Your Honor, is the reason why the counting of the stay of your removal period, you are not a class member. Correct, because you don't have a stay of removal. So the six months runs from the end of the 90 days? No. It runs from the day you're detained, day one, the day you are detained, so long as your case is pending, that is, the government does not have authority to deport you, until 180 days. And that is a simple counting method. It doesn't require any shift to analyze anything else. It's just if the government can't deport you and you've been detained, and can't deport you because not because you're not subject to repatriation, right, can't deport you because they don't have authority to deport you, because your case is not over, right, then the injunction applies to you. And that's the only circumstances under which it applies. Let me see if I understand your position. Your position is that once a person enters this 90-day period, he or she passes out of the picture as far as this lawsuit is concerned? Right, because the 90-day period only applies when you are in the removal period. All right. The removal period only applies to people whom the government is trying to actually So as far as you're concerned, a person who has entered this 90-day period is out of this lawsuit. We don't have to be concerned about whether they get detention hearings or not. That is correct. All right. And the reason it is correct, because it's under this Court's authority already, Ortiz-Alfaro and a number of other cases, if you have a stay of removal, that period is not running. Okay? And obviously if you don't have a final removal order, that period is not running. So I guess I'm confused by you seem to have said two different things. We're talking about you've got a final removal order, and the government has 90 days within which to remove you, putting aside non-cooperation or something like that. During those 90 days, You have no right to a bond hearing under the injunction. Right. So then you're saying that the time for the bond hearing would run at the end of the 90 days. No, Your Honor. Once the government has, well. Because they haven't been able to remove you for whatever reason. They have a final order of deportation. They can't remove you the 90th day comes. That's the period where they're not removing you. Congress hasn't spoken to that period. And then from that point on, you would count the prolonged detention because they have an absolute right. No, Your Honor. The injunction applies to people while their cases remain pending, while they're still litigating. Right. So it starts from day one of your detention. If you get a final order and there is no stay of removal. So now the government is trying to deport you. And 180 days hasn't run yet or whenever. Once that happens, then you don't have a right to a hearing under the injunction anymore because now the government can deport you. The 1231 class, Your Honor, are people who they filed a motion to reopen after they had a prior removal order. And then they got a stay of removal. Either it was granted by the immigration judge or the board or was granted by the circuit court. That's the facts of Juve 2. And that set of people, they no longer are in the removal period because now they have a stay of removal and they are entitled to a bond hearing after 180 days of detention. We are asking for nothing. With respect to those people, it is exactly what this court ordered in Juve 2. That's what we're asking for. It is exactly the same as what the court ordered in Juve 2. Counsel, just to clarify, from one point I might be confused on, if there's an order of removal, but the country of removal won't take the person, so they're still stuck in detention. There's an order of removal, but they're detained. Do they get a hearing in that case? No, I wish they did. Maybe that'll be our next case. I think they're probably entitled to it under Juve 2 already, actually, but that is not part of this injunction, because this injunction is only about people who the government does not have present authority to remove. So it's only about people who have pending cases. There's ambiguity because final order applies to people even after you get a stay of removal, but under the statute it's very clear. If you have a stay of removal, then you are in our class. If you do not have a stay of removal, and the only problem is that the country won't take you back, you're not in our class. That's Zavidus, though. Exactly. Exactly, Your Honor. That is Zavidus, and the hearing procedures under Zavidus, it's a carol for another Christmas or whatever they say. If I may just really quickly, Your Honor, it's not true that 70% are released. Seventy percent have bonds set, but only 70% of those pay it, so actually less than half are released under the statistics that the court does an unopposed request for judicial notice. So I wanted to make that point noted. And finally, they're arguing for 1226A as sort of the don't set an automatic hearing rule, just allow people to request the hearings. And the problem with that, there's two problems with that. The first is detention length, the fact that you've been detained a long time, that does not count as a changed circumstance sufficient to justify even getting a new hearing. Judge Fong, this is in the excerpts at page 834, it's very important if Your Honor is interested in this, in my view, he said, look, the fact that you've been detained a long time, that's not a reason to get a new bond hearing. And so this does not work. It does not work just to let people request their hearings. There has to be an automatic time period, at least a trigger for it, because otherwise it won't happen. And the other thing is we have a lot of evidence declarations in the record. People aren't able to request them. They don't speak English. They don't have access to the courts. For a variety of reasons, that automatic rule which sets, it's a simple rule, that sets the hearing at 180 days, it really makes a huge difference in terms of people's ability to access the court and at least ask, at least to ask a judge for a hearing. All right. Thank you, counsel. Thank you, Your Honor. All right. This session of the court will be adjourned for today. Thank you very much. All rise. This court for this session stands adjourned.
judges: Haddon, Wardlaw, Gould